Case number 17-3441, Shannon Gosbin v. Jefferson County Commissioners. Argument on cases 15-05, 15-06. Good morning. Good morning. Good morning, your honors. My name is Erica Probst, and I represent Shannon Gosbin. I think the crux of the argument in Ms. Gosbin's case is that the trial court judge found that she did not meet her prima facie standard by establishing that she was either replaced during her 30-day suspension or that she had a male comparator who acted insubordinate who was not suspended. With respect to the replacement issue as cited by the court on page 10 of its opinion, the replacement by his own testimony was a male named Mike He was the assistant director. In his testimony, in his deposition, lines 12-23, he testified that he received a telephone call from Commissioner Gentile immediately following the Commissioner's determination to suspend Ms. Gosbin. In his testimony, he stated that Mr. Maple told him, quote, I'm the interim director or acting director, and to get a hold of Stacy, their secretary, and she will give you the Commissioner's email addresses and telephone numbers if you need any help with anything. Please get a hold of us. The question followed. He told you that you were the interim or acting director or that Gentile, the Commissioner, was going to be the acting director. And he said, Mr. Arosevich, a male, he told me that I was. So for the 30-day period, the initial 30-day period that she was suspended, although the court seemed to indicate the record did not sustain or burden-shifting prima facie case standard, it's right there. The second, yes. Is that enough to establish discrimination? The fact she was suspended is the fact that you have to show the discrimination, is it? The fact that she was suspended in and of itself isn't sufficient, no. Nor is her replacement being male. To Judge Sterhienrich's question, where's the discrimination? The discrimination for me is that the trial court acknowledged that the reason for her suspension was unsubstantiated and false. That doesn't mean it's based upon her sex, though. It does when you look at how a director who replaces her after she leaves does not actually follow the direct order given to the director. Can I ask you about that? Because I think when you parse it, and I think it's important to break this down for us to think about it. So to me, there's two commands they think they gave. They clearly didn't really give a command, but they believe they did when they suspended her. Command number one is basically, we're not going to do this exchange for services anymore. And command number two is, let's put this out for bidding. Correct. Okay? They suspend her for, in their mind, not following command number one. Correct? That's their position, yes. Yeah. They say, we told you to do this. You didn't do it. When you go back and look, I think they misremembered. I think the record's pretty undisputed on that point. But nonetheless, they suspended her for that. By the time Erosovich or whatever got in place, Miller wasn't there anymore in an exchange for services. He was there, sometimes the record seems to indicate, because of quoting or bidding. Correct? I don't think sometimes the record seems to indicate. I think Erosovich's testimony was that was who they used all the time, but they were paying for the services. Okay. So it's a different arrangement. It's an arrangement that the city, at least, would think was acceptable or somewhat acceptable. So the question is, to me, how, in other words, if you're being told, here's why we're suspending you. There's no similar command to Erosovich, I'm sorry, I'm butchering his name, in the record, is there? I believe that the command given to put the services out for public bidding so that it would be fair to the entire community is directed at the director. And as part of the record, Mr. Erosovich was at the meeting at the time and was the assistant director. When he becomes the director, he's aware of the admonishment because she was suspended. He's aware that actual direct order is in the minutes. Put the services out for public bidding, which he doesn't do. Right, but they could treat those differently. If I tell you, go do X, and then I tell you, and by the way, do Y, I could treat the consequences for not doing X differently than the consequences for not doing Y, without it being indicative of anything other than I have a preference for one over the other. I would agree if it were not a public, I would agree if you were not using it to justify your behavior, picking one that you believe to be lesser over the other when they're both public orders to act pursuant to our direction, so that the public doesn't believe there's something, bad is not the word I want, but underhanded, if you will, going on with this exchange of services. And because of that particular element, in this particular case, I think it colors everything. Because they were concerned, allegedly, given their statements in the public meeting, with the public perception. And if it's the public perception from which you derive your concern, choosing the former, the bartering, over the latter, the public bidding, which would expose to the public and cure your concern, regardless of how it's paid for, because one can always credit it, because now it's public. I don't believe that choosing X over... What's the difference between the bid and the quote process? Well, in this case, there was one phone call, not made, well, not one phone call, a retraction. There was one direction by Mr. Arosevich to a Walt Kubat to seek for one project, which was some draining of some sewage, some estimates from some local sewage carriers. It wasn't for services for multiple different jobs, which, by the way, are encountered on a daily basis. You said in the other, the other ones were quotes, not bids. Is that the idea? The idea is not only that they were just quotes that weren't given public advertisement, public come ye hither and give me your bidding quotes for all our services. And what's the evidence that the commission was made aware of this and didn't take action? The evidence that the commission was made aware of this and didn't take action. When I asked Commissioner Gentile during his deposition if, like with Ms. Gosbin in the secondary meeting, he followed up to ensure that Mr. Arosevich was making public bidding requests. What is the evidence? Mr. Gentile's evidence was he didn't care. That's what he said. He said it's irrelevant. But he was only there for 30 days, right? He was there for the- Temporary position. He was there for the 30-day period because her suspension was temporary. But you expected him to do the job that your client didn't do in 30 days. No. I'm talking about following her exit just months later after they not only voted to terminate her, cut off all contact with their lawyer, and stopped communicating with her. That's the period of time I'm talking about because the public bidding process that was undertaken and begun by Ms. Gosbin had not been completed. And she was unable to complete it because in a letter written by the commissioners, the lawyers who were assisting her with the public bidding process were unable to speak with her. You say they voted to terminate her in your brief. You don't cite anything. What's the record cite for that? The record cites for that in the deposition of Commissioner Maple and Commissioner Graham and Commissioner Gentile, there is an action, and it's an exhibit, there's an action taken where they vote to terminate her. That action was taken within weeks of her filing her EEOC charge, while they didn't end up terminating her because just weeks later she resigned because- Where do we find that in the record? You say that there's record evidence. There's an exhibit in the deposition of the commissioners Maple, Gentile, Graham. I will. I apologize. And so is it a record of a public meeting? What is the exhibit specifically? The exhibit specifically is an action taken by the commissioners in a meeting. What is the exhibit? Just tell me what the exhibit is. Okay. It is in Graham, okay, Gentile Deposition Exhibit I, Graham Deposition Exhibit T. Okay. Okay. And what is the document? The document is an action by the commissioners. Is that what it's titled, action by the commissioners? Yes, I believe so. So it's a record of a public meeting? No. It's the minutes? No, it is an action taken in a room. They testified. I asked the same. Action, okay. I mean, I don't, you know, I know what county commission meetings are like. But they have a document entitled action of a committee. Is that what it's titled? It's just, it's action by commissioners. They met in private. There was no formal meeting. And there was only two commissioners present. And who authenticated this document? Commissioner Graham and Commissioner Gentile. They signed it or what? Yes. That's how I knew that it was them. And there was only two out of the three commissioners present. All right. Could we see that document, do you think? Do you have it with you? No. I don't have it with me. I don't. Is it in the record? It is in the record. It's attached to the exhibit. All right. Well, we'll take a look at it. In the depositions. Okay. And it is acknowledged that they never communicated that to her. But she. Your argument is that she was constructively discharged. Absolutely. Not that she was actually discharged. Correct. Okay. So this action that they apparently did in private without telling anybody, which would be a violation of the Public Meeting Act and everything else, how does that impact your constructive discharge claim? I believe it establishes that her belief that she was about to be terminated was true.  That letter is also in the record from Commissioner Gentile to Tony Pecora, their attorney, at Stumphauser O'Toole, saying, you are no longer to have any contact with Shannon Gosman, the Director of Water and Sewer, and do not tell her I said that. So that's in the record. They cut off contact with the legal counsel, so she couldn't perform certain duties, including grants, public bidding. She was unable to communicate with the commissioners themselves, and she had a belief that they were going to fire her. So that would be a situation that all reasonable persons would find to be intolerable to continue their employment, that it's an intolerable situation that they have no alternative but to quit. Yes. I believe she couldn't even do her job. It sounds to me like they're putting impediments to her efficient discharge of her job, but I'm not sure what you've said would cause reasonable persons to say that I must quit because the conditions of my employment are so, so intolerable. Well, Your Honor, just months prior to that, in August, she'd been publicly reprimanded and suspended for 30 days. She had also received information from other individuals who had spoken to her, which is in her deposition testimony, including an acknowledgement by Commissioner Gentile himself that he did not want her in the position of director. I mean, most constructive discharge cases, we see so much evidence of intolerable working conditions. I mean, it is such a level that, you know, really a reasonable person could not continue the job. And here, I mean, she has problems, but I just don't think I've ever seen a constructive discharge case be this weak, that's all. Well, I think that the reason that we believe it to be constructive discharge is that by her testimony she couldn't complete her job. I'm not sure that's basis. You still have the suspension claim, a 30-day suspension claim. Yes, absolutely. I believe that to be so. Even if we say that constructive discharge is not sufficient, you have a 30-day suspension claim. But I suppose the evidence on that is a little bit different because you're limited to the time of the suspension. All right, you have no direct evidence of sex discrimination. The circumstantial evidence you have is the hearsay statement that the engineer said one of the commissioners expressed a view that women shouldn't be in the position, that statement. Anything else circumstantially of sex discrimination? I think that the record is replete with it being that she is treated much differently than the male who took over her job. I mean, in every aspect, from control over hiring and firing to she was constantly repudiated in her evaluations for using engineers to complete a myriad of projects. And by definition, he has no engineering degree. And he does the same even though he has no projects awarded after the engineers do the work because he hasn't had any. And he's not even, there's not one iota of that's wrong. So there's none of that. He has free and open discussion with the lawyer. That has not been. Did those aspects occur after she left her employment? Absolutely they had to because the only time that he replaced her. What is the proof that she knew she was being discriminated against? Where's the gender proof before she was? For the 30-day suspension, the proof is in the burden shifting is that she was replaced by a male and the reason for her termination as already acknowledged by the court below was false. There was, he said there was no evidence, the legitimate business justification isn't there. But we still have to find correct that a similarly situated male was treated differently. I don't believe so. If she was replaced for those, if you have a 30-day suspension. If you're suspended for the wrong reason and your replacement's a male, that doesn't automatically make it gender discrimination. There has to be evidence in the record from which a reasonable jury could conclude that a male who did the same thing would have been treated differently and I think your argument on that is look at his, after the fact, all the evidence you just listed plus the fact that the bidding process, they didn't punish him for doing the same thing she was doing. Okay. Okay, I see your red light is on. Did you reserve time for rebuttal? No, I did not, Your Honors. Okay, any further questions? No, thank you. Okay, thank you. Good morning. Good morning, Your Honors. May it please the Court, my name is Molly Gwynn. I am counsel for the appellee, the Jefferson County Commissioners, and I wish to address the reasons the district court correctly granted summary judgment for the appellee. First to start, I think this court has correctly indicated that the adverse employment action here is the 30-day suspension. And I think that even concluding, as the district court did, that the 30-day suspension was perhaps undeserved, the plaintiff has still failed to establish her prima facie case because she has failed to indicate a male who either did not follow a directive or committed other conduct that could be considered. Well, Milosevic didn't follow a directive because the same directive existed that they wanted this put out to bid and it's, I think, undisputed at this point that he didn't follow that directive. Yes, Your Honor, that's correct. Michael Milosevic's testimony, and that is at Record 27, page ID 1193 to 1194, is that Miller septic, he obtained at least three, possibly four, quotes for the process. You agree those are different than bids, right? I do agree with that, Your Honor, yes. But the differentiating factor we would submit is that no one is permitted to dump sewage at the county facility. Miller is only contracted with for the purposes of cleaning out the lift stations and performing the extra service. But if you look at what the Commissioner said at both meetings, they were upset that this was not bid out. And Maple makes that explicit. He says we have two things, basically, we have to get done. We have to terminate this kind of weird agreement and we have to put it out for bid. And he doesn't differentiate between the significance of those. It's clear the Commissioner's thought that the right way to do it was to bid it out. And yet, when she didn't do one half of that, she got suspended. When Milosevic didn't do the other half of that, there was no consequence. Why isn't that evidence that a reasonable jury could find as discriminatory? Well, we would submit that Milosevic was not directed to do that. It was Shannon Gossman who was directed to do that. And the meeting minutes from the June 13, 2013 meeting in the Record indicate that Shannon said I don't agree it was the person in the position. So he assumed the position when she was suspended. He was at the meeting because he says in the Record it cost $250,000 to get a truck. And after that, when he takes over, he similarly doesn't do it. And that's undisputed. And yet there's no consequence for that conduct. Well, we would submit that he took it certainly a step further than she did. He obtained three estimates, which she did not do. He ceased with the unlimited sewage disposal that Miller had at the plant. And Miller was paid. The quotes indicated that Miller came in low. They were $80 lower than the last quote. Again, that's the Milosevic deposition at Record 27. That's 1197 is the page. Miller came in lower. Miller was selected to clean out the grease traps, to clean out the septic tanks for the county. And no haulers were permitted to just dump septage at the facility. And I will submit, Your Honors, that this does require some parsing of the record. But to explain this arrangement, which I think will help the court understand why there is a differential, the original agreement was that Miller was informally permitted to dump their sewage for free at the Barber's Hollow Waste Treatment Center for the county. And that is reflected in Record 29-1, page ID 1529. That was set up by Gilmore, right? I believe that the evidence in the record reflects that there was no evidence that any of the three prior directors were aware of this. This was Joe Siragusanos, the prior director. In any event, she didn't set it up. Absolutely, Your Honor. That is correct. There was an informal exchange whereby they were permitted to dump for free. And in exchange for that, they provided the county with services in the form of cleaning out lift stations that required cleaning and use of the vacuum truck. Mr. Arosevich testified the vacuum truck cleans out the stations more efficiently. The county did have a jetter that was able to do those things as well. That's, again, in Mr. Arosevich's deposition. When the services were terminated, no septic haulers were allowed to dump at the county. That is Arosevich's deposition testimony at Record 27. Miller is now paid based on the obtainal of estimates. Absolutely, Your Honor, is correct. This was not formally competitively bid. We would submit that was not required under Ohio law. These were services in less than $50,000. That's codified at RC 307.86. Do you agree the commissioners wanted it bid, and that's what they said, and that was their directive? I do agree with that, Your Honor. But I would submit that I am not sure that the record is correct that Shannon understood that. Based on her communications with Mr. Pecora, you'll note that Shannon reached out to him and asked him to retrofit an exchange of services agreement, and it was not until after she was reprimanded at the August 16th meeting, some two months after that she obtained permission from counsel to continue with the informal arrangement. So Ms. Gosbin's statement that she understood that she was supposed to bid it is directly contradicted in her testimony and correspondence with counsel that she used unauthorized with the county. But it's unequivocal that the commissioners said you should bid it. Yes, Your Honor, it is. That's correct. And so that's a direct order. Yes, it is, Your Honor. And Arosevich didn't follow it. Well, Arosevich obtained quotes for the services. He didn't follow the order to obtain bids, correct? Correct, Your Honor. And he wasn't reprimanded. Correct, Your Honor. We would submit that that still does not reach the issue of gender discrimination because at this point it is undisputed that the informal services arrangement that the commissioners were concerned with has stopped. You have a situation here where the primary concern was that this was an agreement that these commissioners would not do. None of these commissioners were aware of this practice, and that's undisputed in the record. Commissioner Gentile's affidavit establishes that. The testimony of Dave Maple in the record at 29-1-1538 establishes this isn't the way this board has ever done it. That sentiment is echoed by Dr. Thomas Graham. There is no evidence that any of these commissioners were aware of this prior to the arrangement with Ms. Gosman. So we would submit that no evidence that Mr. Gilmore was similarly situated because no evidence that the commissioners were aware of it, and we would submit that no evidence that Rosevich is similarly situated. As far as this Court's constructive discharge claim, as this Court is aware, this requires working conditions that are so intolerable that a reasonable person would feel compelled to resign. Do you agree that they were going to terminate her? I do not agree with that statement, Your Honor. Ms. Gosman did not become aware. I'd like to clarify this. The documents in the record are informal performance evaluations that the commissioners did and consolidated for purposes of one recommendation. While it is undisputed that two commissioners did recommend her for termination, it is also undisputed that following that she was promoted to the position of director and her termination was never put to a vote. I do not agree that the commissioners Was that before she got suspended they voted to terminate her? I believe it was after her EEOC charge, so no. It was after. I thought she was promoted before. I'm sorry. But I thought she was promoted before she got suspended. She was. That's correct, Your Honor. That's correct. Go ahead. No, I do not agree that the commissioners wished to terminate her. Her termination was never put to a vote. She was given some critical performance evaluations based on This document that the opposing counsel referred to in the deposition, it's a performance evaluation? She said it's an action by commissioners. There was no county vote. Ms. Gosman's termination was never put to a vote. What is this document? Is it a performance evaluation? Yes, Your Honor. Is that what it is? It is. It's not an action by the commissioners. So this performance evaluation indicates that her performance was so bad that two of the commissioners were in favor of her termination? That's correct, Your Honor. And what's the date of the document? I'm not aware of that, Your Honor. I don't know the answer as I stand here today. Okay. Is it after the suspension? It is after the suspension, Your Honor, yes. Okay. But she's not advised of it? She's not advised of the performance evaluation? She did not learn of these because she was presented with one holistic evaluation rather than the three individual ones that they did about her. She did not become aware of those recommendations until after discovery in the lawsuit. Okay. So there is one overall evaluation she gets, and she's given that, but then each of the three commissioners do a separate one, and that's through the separate one you find out that two of the three thought that she ought to be discharged. That's correct. Okay. All right. Just so I know. Thank you. She did not become aware of that document until after discovery. All right. Since she's not aware of it, does it have any relevance to constructive discharge? It maybe shows their intent, I guess, of wanting to let her go. But it was never put to a vote. You will not find anything in the record indicating that Ms. Gosman's termination was put to a vote. As far as the alleged chiding at public meetings, there's no evidence of that in the record. As far as the allegation that Commissioner Gentile would not look at the plaintiff, there's no evidence of that in the record. The statements by Mr. Sidari, Mr. Cain, Mr. Selznick, Mr. Hayes, and Ms. McIntyre obviously all constitute admissible hearsay. The one admissible statement by Commissioner Gentile is admissible as a party-opponent admission, but we would submit supports the conclusion that it was not based on gender discrimination. He stated to her that it is not because you are a woman and it's undisputed. What does the not because refer to, though? Commissioner Gentile made that statement to Ms. Gosman. Ms. Gosman confronted him. I know, but what does not because refer to? It is not because of your gender. What's not because of your gender? That he did not want to see her in management. Okay. And what did Kubat say or Kubat? Mr. Kubat testified that he felt that Shannon was micromanaged, but he had no evidence that that was based on her gender. And that is at record 26, page ID 1064. The record also reflects that after Mr. Gosman and Commissioner Gentile had this exchange, Ms. Gosman was subsequently promoted to the position of the director. And is there any indication how Commissioner Gentile, I guess, voted on making her the director? I believe that the vote was unanimous, Your Honor. I will be honest as I stand here. I'm not certain on that. Ms. Gosman did interview for the position, but I believe he voted to make her the director following that. Again, that is at, I have a record site for that. That's at record 29, page ID 1444. All right. Again, the allegation of more favorable performance reviews for male predecessors. This did not, Ms. Gosman did not learn about this until after the discovery. Same as the recommendation for termination. And we would just submit that this is a case where Ms. Gosman has failed to identify a similarly situated male colleague who was subject to adverse employment action based on the failure to follow a directive. While we would concede that the services were not put out to date. Why wasn't the directive to the position rather than the person? In other words, no matter who holds this position, we want two things done. We want the exchange agreement eliminated and the bid, this put out to bids. And Arosevich didn't follow that. He took over the position. And so why doesn't that show? I'm not sure. Viewed in the light most favorable to the plaintiff as we must. Understood, Your Honor. We would still submit that Arosevich did obtain estimates. There is evidence in the record he obtained at least four quotes for this extra. And you're saying quotes are, you have to assume quotes are the same as bids. But he testified himself that they're different in kind. That's correct. But we would submit that the state statute doesn't require these services given their amount to be put out to bids. Does that matter if the commissioners do? In other words, if the commissioners say, I don't know, you can tell me. But the commissioners say, we want a bid. It seems to me the directive is go get a bid. I think that the commissioner's concern was very correctly that this was an informal agreement. This was an unwritten contract that they had no approval of, and it was an exchange for services. And ergo, there was a situation where parties were benefiting and there was no way to quantify it. And this process needs to be formalized because we don't do things this way. We're a board that does things by the book. And while I would absolutely agree with Your Honor, the competitive bid statute was not followed here, you've still got a situation that is markedly different than what Ms. Gosbin was doing and did not cease doing even after two months and allegedly contacting legal counsel and obtaining an assurance, although there is no indication of that in the record. There was no directive, right? You concede that they didn't actually direct her to get rid of Miller or the exchange agreement. I would not concede. Where did they order that? I would concede that Ms. Gosbin stated that she was suspended for insubordination, and I would concede that Ms. Gosbin stated in the record at page ID 29, excuse me, record 29-1, page ID 1538, I understand that, I understand that, and the statement was to put it out to bid, and this is not the way this board does things. Yes, it could be clearer, but I think that Mr. Arosevich When she contacted Percona or the legal counsel, she was working on putting it out to bid. Well, I think that it's very important that a good, clear understanding of how this correspondence with legal counsel went is before the court, because record 18-4, page ID 555, on 6-17, Ms. Gosbin contacts Mr. Pecora. She indicates that she's been to a meeting, that they've got a situation here where it's an exchange for services, but it's kind of a wash. Doesn't say anything about bidding it. She then follows up with him over a month later on July 26, 2013. That's at record 18-4, page ID 565. She asked Mr. Pecora at that point if they can retrofit an exchange of services agreement. Nothing to do with putting it out to bid. Retrofit a document, create a public record that doesn't exist already, and her exact words are, retrofit an exchange of services agreement just until we formally go out to bid or whatever the commissioners want to do. Pecora subsequently informs her three days later on July 29th that they have no obligation to create a document if one doesn't exist. Nothing else happens. No further contact with Tony Pecora. Nothing. She's then reprimanded for not ceasing the practice at the August 16, 2013 meeting, about three weeks later. That's at record 18-4, page ID 570. She then contacts Mr. Pecora the following Monday, that's a Friday, and she says, per our conversation, can you confirm that they can use the hauler until the bid is implemented? And Pecora subsequently responds that day and says that they can. Again, this is at 18-4, page ID 571. So the allegation that she obtained some kind of assurance from counsel, which she was unauthorized to contact, never approved formally through the commissioners, attorney-client privilege doesn't attach, and I would just quickly like to address the idea that she was somehow thwarted in her job because she could not obtain legal services without the approval of the commissioners. You're out of time, but I'll give you one minute to wrap up whatever you. Thank you, Your Honor. We would just submit that that allegation was not done to thwart Ms. Gosbin and her position, and also the directive to cease with legal services was sent directly to the legal services after Ms. Gosbin returned from her suspension. So we would just respectfully request that this court affirm the district court's summary judgment. Any further questions? No, thanks. Thank you. The case will be submitted. Let me call the next case.